UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Tracey L. Brown,<br><br>  Petitioner<br><br>v.<br><br>The State of Nevada,[1] et al.,<br><br>  Respondents | Case No.: 2:19-cv-02000-JAD-DJA<br><br>**Order Denying Petition for Habeas Relief, Denying Certificate of Appealability, and Closing Case**<br><br>[ECF No. 22] |

Tracey L. Brown's 28 U.S.C. § 2254 habeas corpus petition challenges his convictions arising from eight armed robberies in Las Vegas, Nevada, in July 2011.[2]  Brown claims that juror misconduct, an impermissibly suggestive photographic lineup, and ineffective assistance of trial and appellate counsel violated his Fifth, Sixth, and Fourteenth Amendment rights.  Because I conclude that his claims lack merit, I deny the petition and close this case.

**Procedural History**

In March 2015, a jury convicted Brown of 20 criminal counts including robbery, burglary, and kidnapping with use of a deadly weapon, all related to the armed robberies of convenience stores.[3]  The state district court sentenced him under the large habitual-criminal statute to an aggregate term of 20 years to life in prison.[4]  Judgment of conviction was entered in

---

[1] The state corrections department's inmate-locator page states that Brown is incarcerated at Southern Desert Correctional Center.  Gabriela Najera is the current warden for that facility. At the end of this order, I direct the clerk to substitute Gabriela Najera as a respondent for Respondent State of Nevada.  *See* Fed. R. Civ. P. 25(d).

[2] ECF No. 22.

[3] ECF No. 42-1, Exhibit 95 at 66–72.  Exhibits referenced in this order are respondents' exhibits to their motion to dismiss, ECF No. 30, and are found at ECF Nos. 31–48, 63.

[4] ECF No. 43-4, Exh. 109.

February 2016,[5] and an amended one in February 2017 removed the aggregate total of 20 years to life,[6] so Brown's sentences amount to life with the possibility of parole after ten years.[7] The Supreme Court of Nevada affirmed Brown's convictions in November 2017, and the Nevada Court of Appeals affirmed the denial of his state postconviction habeas corpus petition in October 2019.[8]

Brown dispatched his federal habeas petition for filing in November 2019.[9] I granted his motion for counsel, and he filed a counseled amended petition that following June.[10] After a dismissal motion,[11] four claims remain, which have all been fully briefed on their merits:[12]

> Ground 1.   Jury misconduct deprived Brown of his Fifth, Sixth, and Fourteenth Amendment rights;
>
> Ground 2.   An improperly suggestive photographic lineup and resulting unreliable identifications violated Brown's Fifth, Sixth, and Fourteenth Amendment rights;
>
> Ground 3.   Brown was deprived of his Fifth, Sixth, and Fourteenth Amendment rights due to ineffective assistance of trial counsel; and
>
> Ground 4.   The ineffective assistance of appellate counsel resulted in violations of the same rights.

---

[5] *Id*.
[6] ECF No. 44-10, Exh. 135.
[7] *Id*.
[8] ECF No. 45-1, Exh. 145; ECF No. 48-12, Exh. 174.
[9] ECF No. 11.
[10] ECF Nos. 10, 22.
[11] ECF No. 54 (order granting in part motion to dismiss).
[12] *See* ECF Nos. 62, 66.

**Facts underlying Brown's convictions**[13]

**A.     Robberies on July 18 and 19, 2011**

Robert Stout testified that he was working at Terrible's North Rancho on July 18, 2011.[14] About 4:30 a.m., a man came in with a shirt covering half his face; he was holding a gun and told Stout to empty the register into a bag. He filled another bag with cigarettes, including Kools, directed Stout to lie down on the floor, and left. Stout got up to call 911 and noticed that, while the bags of cigarettes were gone, the bag of money was still on the counter. He identified Tracey Brown in the surveillance video.

The next day, Dale Kluge was working at the AM/PM North Rancho when a man came in about 2:45 a.m. and told Kluge this was a robbery.[15] The man pointed something at Kluge that he had under his shirt. Kluge pushed it away; it felt like a gun. The man walked Kluge to the register, emptied the money into a bag and then put cigarettes and cigars in the bag. He directed Kluge to lie down and left. Kluge was unable to identify Brown from a photo lineup; he identified surveillance video of the incident.

**B.     July 22, 2011, robberies**

Chanell Croston testified that she was working at Terrible's North Rainbow on the night of July 22, 2011, when it was robbed by a black male and a black female.[16] The pair had come into the store about an hour earlier asking for directions. About 2 a.m., Croston was standing

---

[13] These facts are taken from the trial transcripts (ECF Nos. 38-2, 39-1, Exhs. 91, 92). I make no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court, and I do not summarize all material. My summary is merely a backdrop to my consideration of the issues. Any absence of mention of a specific piece of evidence or category of evidence does not mean that I overlooked it.

[14] ECF No. 39-1, Exh. 92 at 48–58.

[15] *Id*. at 212–34.

[16] ECF No. 38-2, Exh. 91 at 40–59, 63–73.

outside smoking a cigarette when the male approached her, pressed something covered by a gray shirt that felt like a gun into her side and led her back into the store.  He directed her to open the register and put the money in a bag.  The female came into the store and took cigarettes, including Kools.  Both robbers had their faces covered up to below their noses.  The male brought Croston to the back room and told her to lie down.  Once she heard the front doors, she called 911.  She pointed out the robbers in the surveillance video.  She later identified Brown and his girlfriend Teshae Gallon from photo lineups, and she identified Brown at trial.  Croston observed that Brown's eyes were distinctive.  A fingerprint lifted from a Kools pack was later identified as Gallon's.[17]

      Sharon Uddin testified that she was working at 7-Eleven West Charleston when a man came in about 2:30 a.m.[18]  His shirt partially covered his face, the hood of his sweatshirt was pulled up, and he was pointing a covered gun at her.  He directed her to open the register.  Uddin's husband, David Jimenez, came in from the back cooler and started yelling at the robber.  The robber ran out of the store.  Uddin identified Brown in court.  As she was recounting the incident to police, she recalled that a woman had come into the store and then left just before the man entered the store.  She was unable to identify Brown in a photo lineup.  At trial, she pointed out Brown and Gallon in the surveillance video.  Jimenez testified that he ran out of the store after the man and saw him drive away in a Chevy Cavalier.[19]

---

[17] ECF No. 39-1, Exh. 92 at 191–92.
[18] *Id*. at 7–34.
[19] *Id*. at 38.

C.     **July 24, 2011, robbery**

Joseph Uperti was working at Sinclair's Smoke Ranch on July 24, 2011.[20]  About 2:30 a.m., a black man came in with his shirt halfway over his face, told Uperti he had a gun, and demanded that Uperti empty the register.  After the man left, Uperti called the police.  The prosecution showed the surveillance video.  Uperti later identified Brown from a photo lineup "immediately" because his eyes stood out.

## Analysis

A.     **Standards of review under the Antiterrorism and Effective Death Penalty Act**

Federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act, also known as "AEDPA."  If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[21]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[22]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[23]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or

---

[20] *Id*. at 58–74.

[21] 28 U.S.C. § 2254(d).

[22] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[23] *White v. Woodall*, 572 U.S. 415, 424–26 (2014).

"license federal courts to treat the failure to do so as error."[24] The "objectively unreasonable" standard is difficult to satisfy;[25] "even 'clear error' will not suffice."[26]

Under AEDPA, the bar is high,[27] and federal habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[28] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[29] "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[30] AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[31]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim *de novo*.[32] The petitioner bears the burden of proving

---

[24] *Id.* at 1705–06 (emphasis in original).

[25] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[26] *Wood v. McDonald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[27] As the United States Supreme Court acknowledged in *Harrington v. Richter,* 562 U.S. 86, 102 (2011), "If this standard is difficult to meet, that is because it was meant to be."

[28] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[29] *Id.* at 103.

[30] *Id.* at 101.

[31] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[32] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

by a preponderance of the evidence that he is entitled to habeas relief,[33] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[34]

**B.     Adjudicating Brown's claims**

   ***1.     Ground 1 fails because Brown was not prejudiced by misconduct in the jurors' presence.***

Brown argues in ground 1 that prejudicial juror misconduct violated his constitutional rights.[35] The Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury."[36] "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation," but it does mean "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."[37] "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."[38]

Teshae Gallon, originally Brown's co-defendant, testified that she pleaded guilty to reduced charges with the possibility of parole, and she agreed to testify against her boyfriend, Brown.[39] She drove Brown's car on July 22, 2011, when they committed three robberies. At

---

[33] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[34] 28 U.S.C. § 2254(e)(1).

[35] ECF No. 22 at 10–14.

[36] U.S. Const. amend. VI; *see Duncan v. Louisiana*, 391 U.S. 145 (1966) (incorporating the Sixth Amendment right to trial by jury into the due-process clause of the Fourteenth Amendment).

[37] *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

[38] *Id*. at 215.

[39] ECF No. 40-1, Exh. 93 at 79–109.

trial, she identified herself and Brown in surveillance videos from the convenience stores depicting the robberies.

The next court day after Gallon testified, the state district judge had the marshal tell the parties outside the presence of the jury that a juror had come to him that morning.[40] The juror said that, on the prior Friday, jurors were riding down in the elevator in the courthouse at the end of the day when Gallon and a friend who had accompanied her to court got on the elevator:

> Ms. Gallon's friend started speaking loudly in front of the jury saying, All you guys have to do is look at the video, and you'll see who it is. And then she turned to talk to Ms. Gallon, still rather loudly saying, It's okay. You told the truth. That's all you had to do. That's all anybody expected of you. You told the truth. So you did what you were supposed to do.[41]

Gallon didn't say anything. There were about eight jurors on the elevator.

The state district judge, the prosecutor, and the defense questioned all jurors and alternates individually about the incident. Several jurors had not been in the elevator. The juror who first approached the marshal about the incident related that the elevator doors opened, Gallon said "oh that's the jury."[42] Her friend "yanked" her into the elevator and said "Oh it doesn't matter. We're not talking about to them. We're just talking to ourselves." Speaking loudly, she said something like "you should just tell them to look at the tapes, just look at the tapes. That says everything."[43] The incident was short, and the juror didn't think it was a big deal and told the court it would not affect her deliberations in any way.

---

[40] ECF No. 41-1, Exh. 94 at 4–15.
[41] *Id*. at 4–5.
[42] *Id*. at 28–33.
[43] *Id*. at 29.

A second juror testified that Gallon and her friend got on the elevator, and the friend began talking in what he thought was an intentionally loud voice.[44] He didn't recall exactly what was said, just that it was about the trial. He said that he had forgotten that it happened until the court asked him. Another juror told the court that Gallon hesitated about getting in the elevator when she saw the jury, and someone in the elevator told her it was ok because they only had a couple of floors to go down.[45] Gallon and her friend had their backs turned away from the jurors and were conversing. He didn't really hear what they were talking about. Another juror said she saw the two women get in the elevator.[46] The juror was texting her kids and not paying attention to anything else. She recalled the women were talking loudly about their hair or why one of them wore something on her head.

The defense moved for a mistrial.[47] The court and the parties agreed that misconduct occurred, but the prosecution argued that nothing prejudicial took place. The court agreed, reasoning that the jury had seen the surveillance videos for themselves, sufficient evidence supported the convictions without Gallon's testimony, and most of the jurors didn't hear the exchange at all. The court told the defense that it could decide whether to replace the juror who remembered Gallon's friend as having said something about Gallon having told the truth and that all the jury had to do was look at the tapes with an alternate who had not been present in the elevator. Just prior to closing arguments, the defense informed the court that it had decided not to replace the juror.[48]

---

[44] *Id*. at 15–21.
[45] *Id*. at 33–37.
[46] *Id.* at 38–41.
[47] *See id*. at 84–86.
[48] *Id*. at 140–141.

The Ninth Circuit recently explained in *Von Tobel v. Benedetti* that Nevada's test to evaluate juror misconduct is not contrary to, nor does it involve an unreasonable application of, clearly established federal law:

> The test for allegations of juror misconduct in Nevada comes from *Meyer v. State*[]. Under it, a motion for a new trial based on allegations of juror misconduct has the burden to show that (1) the misconduct occurred and (2) the misconduct prejudiced the defendant. When the misconduct is egregious, the Nevada Supreme Court applies a conclusive presumption of prejudice without any showing of prejudice. When the misconduct is not egregious, the defendant must prove prejudice by showing that, in reviewing the trial as a whole, there was "a reasonable probability or likelihood that the juror misconduct affected the verdict."
>
> * * *
>
> Von Tobel[, the defendant] contends that *Meyer* is contrary to [clearly established federal law] because it placed a more onerous burden on him to show prejudice. Von Tobel misreads *Meyer*. *Meyer* only requires the petitioner to show "a reasonable probability or likelihood that the juror misconduct affected the verdict" in order to prevail on a motion for a new trial. [Thus] a defendant's burden under *Meyer* falls within the range allowed by Supreme Court precedent. There is no clearly established Supreme Court precedent which holds that a defendant's burden to show that a contact was "possibly prejudicial" is less onerous than "a reasonable probability or likelihood that the juror misconduct affected the verdict," or "a probability sufficient to undermine confidence in the outcome."[49]

On direct appeal, the Supreme Court of Nevada agreed that misconduct occurred but held that Brown failed to show prejudice from it:

> Appellant Tracey Lewis Brown first argues that juror misconduct warranted a new trial. To obtain a new trial for juror misconduct, Brown had to show that juror misconduct occurred and that the misconduct was prejudicial. We review the district court's denial of such a motion for an abuse of discretion and its conclusions

---

[49] *Von Tobel v. Benedetti*, 975 F.3d 849, 851, 853–56 (9th Cir. 2020) (internal citations omitted) (quoting *Meyer v. State*, 80 P.3d 447, 455–56 (Nev. 2003)).

>regarding the prejudicial effect of any misconduct de novo. While the attempt by a witness's friend to discuss the witness's testimony in an elevator with several jurors in it constituted misconduct, Brown did not show prejudice. The record shows that there was not a reasonable probability that the misconduct affected the verdict where most of the jurors either did not remember what was said or remembered only that the friend talked about what the witness was wearing on her head; the information was vague, cumulative of the surveillance video evidence of the crimes, and not relevant to any material issue; and, when canvassed, all of the jurors stated that the misconduct would not affect their deliberations in any way and were appropriately admonished. Accordingly, Brown has failed to show that the district court abused its discretion by denying his motion for a new trial.[50]

Brown has not shown that the Supreme Court of Nevada's decision that there was not a reasonable probability that the admitted misconduct affected the verdict was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[51] It seems clear that Gallon's friend was vouching for Gallon's truthfulness in the elevator. But, for the most part, the jurors didn't even hear her statements. The convenience-store surveillance videos were sufficient evidence without Gallon's testimony, who proved a reluctant witness in any event. Finally, the state district court gave the defense the option of replacing the one juror who had heard the statements the most clearly with an alternate who had not been in the elevator. I deny federal habeas relief on ground 1.

### 2.    *Ground 2 fails because the photographic lineup was not unduly suggestive.*

Brown contends in ground 2 that the photographic lineup was impermissibly suggestive in violation of his Fourteenth Amendment due-process rights, and the lineup should have been

---

[50] ECF No. 45-1, Exh. 145 at 2–3 (citing *Meyer v. State*, 80 P.3d 447, 453, 455 (Nev. 2003)) (internal citations omitted).

[51] 28 U.S.C. § 2254(d).

11

suppressed.[52] To determine whether a challenged identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification, federal courts must examine the totality of the surrounding circumstances.[53] If the challenged procedure is not impermissibly suggestive, the inquiry into the due-process claim ends.[54]

To determine whether the identification was sufficiently reliable to warrant admission, the court weighs the indicia of reliability against the "corrupting effect of the suggestive identification procedure itself."[55] Factors to consider in evaluating the reliability of both in-court and out-of-court identifications include: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the subject; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[56]

The photo lineup here showed six black males.[57] Four appear to have either braided, cornrowed, or dreadlocked hair. The other two had hair that looked like it could have been recently braided or cornrowed. All of the subjects' mouths are closed, except for Brown, who

---

[52] ECF No. 22 at 15–18. On appeal, the photographic lineup provided to the Supreme Court of Nevada was a poor copy. *See* Exh. 145 at 6–7.

[53] *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Stovall v. Denno*, 388 U.S. 293, 301–02 (1967); *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).

[54] *See United States v. Davenport*, 753 F.2d 1460, 1463 and n.2 (9th Cir. 1985); *United States v. Love*, 746 F.2d at 478.

[55] *Manson v. Brathwaite*, 432 U.S. 98, 113–14, (1977).

[56] *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972); *U.S. v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985).

[57] ECF Nos. 22-1, 23-1. Even considering the clear, color copy of the lineup that Brown provided to this court but that the Supreme Court of Nevada did not have for their review, I conclude that the lineup was not unduly suggestive and did not violate Brown's due process rights.

has his lips somewhat parted.  Four of the men appear to have a similar skin color, while two have noticeably lighter skin.

Detective Eric Stout testified that he created the photo lineup.[58]  He said that he had prepared hundreds of lineups and had learned how to select photos on the job from other detectives.  He explained that he inputs the race, gender, and age, and the computer generates pages of photos.  He then selects photos; in this case he looked for men who looked similar to Brown, for example having similar facial hair.  He said he tried to include subjects that had braided or cornrowed hair.  Stout also pointed out that the photo-lineup witness instructions that the witnesses must read and sign advise witnesses not to pay attention to hairstyles because those are easily changed.[59]  On cross-examination, Stout agreed that Brown was probably the darkest-skinned man in the lineup.  He said it might just be the photo quality, and in Stout's view there were two other men in the line-up with similarly dark skin.

The Supreme Court of Nevada rejected Brown's photo-lineup claim on direct appeal:

> Brown argues that the photographic lineups presented to the witnesses were impermissibly suggestive because his photograph had the darkest skin tone and was the only one matching the suspect's hairstyle and with visible teeth.  Noting that our review is limited because Brown has not provided a copy of the lineup and that we are constrained to the poor-quality image included in the State's appendix, *see Thomas v. State*, 83 P.3d 818, 822 & n.4 (Nev. 2004) (noting that appellant bears the duty of providing the "portions of the record essential to determination of issues raised in appellant's appeal"), we note that all of the individuals pictured appear to be black men; that the detective informed the witnesses that hairstyles are easily changed; and that, even if visible, Brown's teeth were not suggestive of the subject, as the lower portion of the suspect's face was covered in each robbery.  As the individuals pictured matched the general description of the suspect, Brown has failed to show that the photographic lineup was "so impermissibly suggestive as to give rise to a very substantial

---

[58] ECF No. 40-1, Exh. 93 at 17–65.

[59] *See* ECF No. 23-1.

> likelihood of irreparable misidentification." *Thompson v. State*, 221 P.3d 708, 713 (Nev. 2009). Accordingly, Brown has not shown that the district court erred in refusing to exclude the identifications.[60]

Several victims examined the photo lineup about nine days after the robberies. Two of the convenience store clerks identified Brown from it, each mentioning at trial that Brown had distinctive eyes. As the Supreme Court of Nevada observed, Brown covered the lower part of his face during the robberies, so the fact that he was the only one showing teeth in the lineup didn't bear on the identifications. Some of the victims had described Brown's hair as cornrowed or braided. The hair of each subject in the lineup differed somewhat, but all could arguably fit the description victims gave to police. And the witnesses who looked at the lineups had to read and sign a section advising them not to pay attention to hairstyles because they are easily changed.

Brown thus fails to demonstrate the Supreme Court of Nevada's decision that the lineup was not impermissibly suggestive was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[61] So I deny habeas relief on ground 2.

### 3. *Grounds 3 and 4 fail because Marshal Triplett's testimony was not inconsistent, so trial counsel and appellate counsel were not ineffective when they didn't move to suppress the testimony or raise this issue on appeal.*

Grounds 3 and 4 are both ineffective-assistance-of-counsel claims. Brown theorizes that he received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment

---

[60] ECF No. 45-1, Exh. 145 at 6–7.

[61] 28 U.S.C. § 2254(d).

14

rights because trial counsel failed to file a motion to suppress based upon the alleged inconsistent statements of Las Vegas Deputy City Marshal Matthew Triplett (ground 3) and appellate counsel failed to argue on appeal that Triplett's testimony was inconsistent (ground 4).[62]

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[63]  Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[64]  In *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[65] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[66]  A probability is a reasonable one when it is "sufficient to undermine confidence in the outcome."[67]  Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[68]

When an ineffective-assistance-of-counsel claim is based on appellate counsel's actions, a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and "that, but for his [appellate] counsel's

---

[62] ECF No. 22 at 18–22.

[63] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[64] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

[65] *Strickland*, 466 U.S. at 690.

[66] *Id.* at 694.

[67] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[68] *Strickland*, 466 U.S. at 689.

unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal."[69] "[T]o determine whether appellate counsel's failure to raise [certain] claims was objectively unreasonable and prejudicial, [the court] must first assess the merits of the underlying claims."[70]

Brown argues that, in certain proceedings, Triplett testified that he initially stopped Gallon and Brown's vehicle because they did not have the headlights on at night—an ordinary traffic stop—yet, in other proceedings, Triplett testified that it was a felony stop because Triplett had information about the robbery earlier that evening and a description of the getaway car. Brown characterizes Triplett's testimony as a "flip-flop-flip."[71]

Marshal Triplett testified before the grand jury in September 2011 that on July 26, 2011, he saw a tan Chevy enter the freeway in Las Vegas around 1 a.m. with no headlights on.[72] He said the vehicle was not traveling in a reckless manner but was going faster than the normal flow of traffic. He first flashed his headlights to try to alert the driver that the headlights were not on. The driver did not respond in any way. Triplett activated his emergency lights to initiate a traffic stop. As he followed the Chevy down an off-ramp, the driver would slow almost to a stop and then when Triplett started to exit his patrol car the Chevy would start moving again. After he fully activated his siren, the car came to a full stop. Triplett exited his vehicle but stayed behind the door. The passenger started walking toward him rapidly. He wouldn't show Triplett his hands, so the officer raised his gun. The man suddenly spun around and fled. Triplett had the driver—later identified as Gallon—get out of the car, and he took her into custody. Backup arrived and caught up with the fleeing passenger—later identified as Brown.

---

[69] *Smith v. Robbins*, 528 U.S. 259, 285 (2000).
[70] *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).
[71] *Id*. at 22.
[72] Exh. 10 at 9–11.

One robbery was tried separately in federal court.[73] Triplett testified at that federal trial that the reason he stopped the Chevy was because the headlights were off.[74] He testified at Brown's state trial that on the night in question he saw the Chevy getting on the freeway with its lights off and going a little faster than the other cars around it.[75] Triplett flashed his headlights to alert the driver. When the driver did not turn on the lights, Triplett activated his emergency lights to conduct a traffic stop.

The Nevada Court of Appeals held that—while Brown argued that the officer testified in some proceedings that he stopped the car because the headlights were off and in other proceedings that he conducted a felony traffic stop—the record reflected that the officer testified consistently.[76] The state appellate court concluded that any motions filed by counsel would have been futile and that Brown failed to demonstrate that counsel was deficient or show resulting prejudice. The court rejected the claim of ineffective assistance of appellate counsel as meritless on the same basis.[77]

Brown urges that a state knowingly obtaining a conviction through use of false evidence or allowing unsolicited false evidence to go uncorrected violates the Fourteenth Amendment.[78] But Brown claims baselessly that Triplett testified inconsistently about the traffic stop. The state-court record and the excerpt from the related federal case completely belie this claim. Brown presents nothing to show that Triplett testified inconsistently, let alone falsely. Trial

---

[73] Case No. 2:11-cv-334-APG-GWF.
[74] *See* ECF No. 24-1.
[75] ECF No. 63-1, Exh. 181 at 92–105.
[76] ECF No. 48-12, Exh. 174 at 3.
[77] *Id*. at 5.
[78] *Napue v. People of State of Illinois*, 360 U.S. 264, 269 (1959).

counsel cannot have been ineffective for failing to file a motion to suppress just as appellate counsel cannot have been ineffective for failing to argue that the testimony was inconsistent. Failure to raise a futile or meritless argument does not constitute deficient performance.[79] Brown has not demonstrated that the Nevada Court of Appeals' decision was contrary to or involved an unreasonable application of *Strickland*.[80] Federal habeas relief is thus denied on both grounds 3 and 4.

## C. A certificate of appealability is not warranted.

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability. To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[81] "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[82] Because I have rejected Brown's constitutional claims on their merits, and he has not shown that this assessment of these claims is debatable or wrong, I find that a certificate of appealability is unwarranted for this case, and I decline to issue one.

---

[79] *See Kimmelman v. Morrison*, 477 U.S. 365 (1986); *Wilson v. Henry*, 185 F.3d 986, 991–92 (9th Cir. 1999) (counsel not ineffective where motion for new trial "would have been to no avail"); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (finding no ineffective assistance where the motion that allegedly should have been made would have been futile).

[80] *See* 28 U.S.C. § 2254(d).

[81] 28 U.S.C. § 2253(c).

[82] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

**Conclusion**

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus under 28 U.S.C. § 2254 **[ECF No. 22] is DENIED**, and because reasonable jurists would not find the decision to deny this petition to be debatable or wrong, a **certificate of appealability is DENIED**.

The Clerk of Court is directed to SUBSTITUTE Gabriela Najera for Respondent State of Nevada, ENTER JUDGMENT accordingly, and CLOSE THIS CASE.

_____
U.S. District Judge Jennifer A. Dorsey
March 29, 2023